# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NIKHIL GUPTA, *et al.*,

    *Plaintiff*,

  v.

2ND WAVE LLC, *et al.*,

    *Defendants*.

Civil Action No. 23 - 3647 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

  Nikhil Gupta brought this action against his former employer 2ndWave LLC and its Chief Executive Officer Keith Taylor to recover incentive payments that he claims he earned during his eight years of employment. He alleges breach of contract, fraud, and retaliatory termination. The Parties have cross-moved for summary judgment. Mr. Gupta seeks partial summary judgment on his claim that 2ndWave breached his employment contract. And 2ndWave seeks summary judgment on all Mr. Gupta's claims, arguing that Mr. Gupta was paid any incentives he was owed and terminated because of performance deficiencies.

  At bottom, the Parties tell two different stories about what Mr. Gupta was promised, what he was paid, and whether he should have acted sooner to recoup any losses he sustained. Neither story is inherently unreasonable. Though the current record could certainly support a conclusion that Mr. Gupta has been paid everything he was owed, it is not for the Court to weigh the evidence and assess the credibility of the Parties at summary judgment. That is a task for the jury. And it is possible that a reasonable jury presented with all the evidence could find that Mr. Gupta's tale is the more compelling one. Such divergent outcomes are always possible when material facts are in

dispute. Accordingly, summary judgment is inappropriate on nearly all Mr. Gupta's claims. With two notable exceptions, the Court denies the Parties' motions.

## BACKGROUND

### A.    Factual Background

The Court draws the facts from the Statements of Material Facts submitted by the Parties and the underlying materials referenced by those statements. *See* Defs.' Statement of Material Facts (DSOF), ECF No. 26-1; Pl.'s Statement of Material Facts (PSOF), ECF No. 27-2; Defs.' Resp. to PSOF, ECF No. 28-1; Pl.'s Resp. to DSOF, ECF No. 29-2. The Court assumes those facts to be true unless they have been specifically disputed. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1] The Court also draws undisputed background facts from the Complaint.

Nikhil Gupta graduated from the University of Maryland with a degree in Management Science and Statistics. First Am. Compl. (FAC) ¶ 10, ECF No. 11. In 2005, he began working at Deloitte Consulting where he first met and worked with Keith Taylor, a lead partner on one of Mr. Gupta's key projects. FAC ¶ 12; *see also* Gupta Decl. ¶ 2, ECF No. 29-1. When Mr. Gupta applied to business school, Mr. Taylor wrote him a letter of recommendation. Gupta Decl. ¶ 2. Mr. Taylor also asked if Mr. Gupta might be interested in working for him after completing his graduate degree. *Id.* ¶ 3. Mr. Gupta said that he "would certainly entertain an offer." *Id.*

After graduating from business school in 2009, Mr. Gupta worked at a different consulting firm for several years. *Id.* ¶ 4. Eventually, he decided that he wanted to return to a "large world-class firm" and began exploring options to do so. *Id.* ¶ 5. He also contacted Mr. Taylor to discuss opportunities with Mr. Taylor's recently established company, 2ndWave LLC. *Id.* ¶ 6. These

---

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

conversations proved fruitful. On September 27, 2015, Mr. Taylor emailed Mr. Gupta an Offer

Letter inviting him to join 2ndWave as a "***Senior Manager*** in [the] ***Enterprise Solutions Group***,"

and providing "[d]etails of the offer and projected salary." Pl.'s Mot. Partial Summ. J., Ex. 1 (Offer

Ltr.) (emphasis in original), ECF No. 27-4; PSOF ¶¶ 1–12; DSOF ¶ 2.

The Offer Letter explained that Mr. Gupta's "total compensation [would] be based on two

primary components – base salary and incentives." Offer Ltr. 1. The base salary offered was

$160,000 per year. *Id.* The incentives were divided into three different categories:

### Sales Incentives

As a Senior Manager, it is also expected that you will contribute to the growth of
the firm through the generation of additional revenue. If you contribute, in a
significant way, in identifying and closing new opportunities for 2nd[W]ave, you
will be eligible for a sales incentive bonus. This annual bonus will be based on a
percentage of collected revenue above our baseline revenue target. That baseline
revenue target is calculated/negotiated on an annual basis, and is generally based
on the existing sold work. In those instances where you serve as the lead in
generating sales above the baseline target, you will be eligible for the bonus. These
baseline revenue amounts and bonus targets are discussed in advance, and the final
bonus amounts are at the sole discretion of the 2ndWave CEO.

### Utilization Incentives

The base salary amount will be supplemented with a utilization incentive. If your
achieved utilization meets or exceeds an established target, your base salary will be
supplemented with a utilization bonus. These calculations are based on utilization
calculated at the total hours billed to clients divided by total billable hours per year
(i.e., 2080). It also assumes a minimum billing rate of approximately $125 per hour
(unless a specific exception is made for market development purposes). Pro-rated
bonus amounts will be paid quarterly, and adjusted at year end (if applicable).

### Other Firm Incentives

You will also be eligible for a bonus based on helping the firm reach certain
objectives. A maximum bonus amount will be pro-rated based on how many of the
firm objectives were met.

*Id.* 1–2. The Offer Letter explained that "[d]etails of these incentive payments" were provided in

an attached "Incentive Compensation Components document (in draft form)" that "[would] be

finalized in discussions with you within the first 30 days of employment." *Id.* 2. The Offer Letter

3

also described other benefits that Mr. Gupta would be entitled to that were "under development, including healthcare, dental, optical, and 401(k) plans." *Id.* 2.

The Attachment to the Offer Letter, titled "Incentive Compensation Components (DRAFT)," is addressed to Mr. Gupta and dated "<u>Fiscal Year:</u> 2016 (and 4th Quarter 2015)." *Id.* 4. The Attachment begins with a "summary" stating that "[i]ncentive compensation for the 2015-2016 timeframe [would] be based on a combination of sales/revenue targets, utilization targets, and meeting other non-financial targets." *Id.* And it states that "baseline revenue amounts and bonus targets are discussed in advance, and the final bonus amounts are at the sole discretion of the 2ndWave CEO." *Id.* It then provides a chart with additional details about each incentive category. *Id.*

- Sales Incentives would be calculated as "[u]p to 3% of collected revenues tied to [any] new opportunity" that Mr. Gupta helps "identify[] and clos[e]" and for which he "serve[s] as the lead in generating sales above the baseline target." *Id.* This percentage would be reduced to the extent it is "'shared' with others" and would "decrease by one third every 12 months" for the maximum "payout time period of 3 years." *Id.*

- A Utilization Incentive would be awarded where Mr. Gupta's "total hours billed to clients divided by total billable hours per year" exceed a certain threshold. *Id.* The Attachment specifies that the "[u]tilization threshold for 2015-2016 is <u>60 percent</u>," and that the "[b]onus is $400 for every percentage point above threshold. For example, achieved utilization of 20 percent above the target results in an $8,000 bonus." *Id*. 4-5.

- An Other Objectives bonus would be awarded where Mr. Gupta "help[ed] 2nd[W]ave meet other business development, internal infrastructure, and staff recruitment/development objectives." *Id.* 5. These include developing "internal infrastructure" and processes related

4

to human resources, business development, and recruiting; identifying and submitting proposals for new business opportunities; and meeting "other targets as defined in discussion with the CEO." *Id.* The bonus for these activities would be "based on [the] percentage of objectives achieved by the firm" and was capped at "$10,000." *Id.*

The Offer Letter was signed by Mr. Taylor as 2ndWave's CEO and, at the bottom, provided a signature line for Mr. Gupta under the words "***I accept this offer***." *Id.* 3 (emphasis in original). The Attachment concludes with the sentence: "I agree that this document represents the incentive compensation targets for the 2015-2016 timeframe." *Id.* 5. It then provides two blank signature lines for "Signature of CEO" and "Signature of Employee." *Id.* Mr. Gupta signed and returned the Offer Letter on September 29, 2015. *Id.* 3; DSOF ¶ 3; PSOF ¶ 10. Neither Mr. Gupta nor Mr. Taylor ever signed the Attachment. DSOF ¶ 5.

Mr. Gupta started with 2ndWave on October 1, 2015. DSOF ¶ 12. Over the following seven and a half years, he worked on various projects for the firm. Compl. ¶¶ 28–104. Along with client services and business development, Mr. Gupta helped develop and implement internal operations processes related to recruiting and human resources. *Id.*

Initially, things seemed to go as both Parties had planned. 2ndWave made two bonus payments to Mr. Gupta following his first two quarters of employment (for the fourth quarter of 2015 and the first quarter of 2016). DSOF ¶¶ 13–14. Around the middle of 2016, however, the firm stopped paying bonuses to all employees because it "was in a weak financial position . . . and did not have sufficient cash flow." DSOF ¶¶ 15–16. This situation continued through 2017. *Id.*

2ndWave resumed paying bonuses in December 2018. DSOF ¶ 18. In announcing those bonuses, Mr. Taylor sent the below email to "all 2ndWave employees":

All –

As we've discussed, we continue to refine our performance management and compensation structure. Regardless of the final structure, some level of variable compensation, in the form of bonuses, will be an essential element. We anticipate that our final bonus structure will include components based on both firm-wide performance and individual performance.

In that vein, we have decided to provide year-end bonuses based primarily upon our firm-wide results for 2018. You will see those bonuses reflected in the 12/14/2018 paydate (pro-rated for the length of time you've been on board).

Thank you for your contributions in 2018, and we look forward to an exciting and prosperous 2019!

ket

DSOF ¶ 18; ECF No. 26-10. Mr. Gupta received a bonus that year of $5,865. DSOF ¶ 21. In each of the four years that followed, Mr. Gupta received bonuses of $8,405.42 (2019), $7,164.00 (2020), $6,865.00 (2021), and $21,000.00[2] (2022). DSOF ¶¶ 21–33. In his firm-wide emails announcing bonuses in each of those years, Mr. Taylor noted that the bonuses were based on both the firm's performance and individual results and suggested that 2ndWave was continuing to refine its compensation structure and approach. DSOF ¶¶ 18–32. Most years, Mr. Gupta responded to Mr. Taylor's announcements by thanking him for the bonus he was awarded. DSOF ¶¶ 25–31.

While Mr. Gupta does not dispute that he received these year-end bonuses, he alleges that he repeatedly asked Mr. Taylor about the other incentive payments described in his Offer Letter. Gupta Decl. ¶¶ 13–19. He says that while he agreed to defer his incentives in 2016 at Mr. Taylor's request, he followed up early in 2017 to ask when his "2016 Utilization Incentives would be paid."

---

[2] Mr. Gupta asserts, and the Defendants do not appear to dispute, that his bonus in 2022 included a $10,000 Sales Incentive for work on a "large Ginnie Mae IT Systems Maintenance contract." Gupta Decl. ¶¶ 20–21; *see also* ECF Nos. 30-6, 30-7 (email from Mr. Taylor explaining that "[s]ales incentives have been rolled into the overall team bonus, with some exceptions for wins that 'move the needle' such as the recent Ginnie Mae project," in response to email from Mr. Gupta claiming that he has never been paid a Sales Incentive except in 2022 "on the win for Ginni[e] Mae IT SA").

*Id.* ¶ 14. According to Mr. Gupta, Mr. Taylor told him that 2ndWave had not "looked at that quarter yet, but [would] soon . . . [and] [w]as waiting until [it was] back 'in the black.'" *Id.* Mr. Gupta claims that he made similar inquiries about the incentives he was owed later in 2017, and then again in 2018, 2019, and 2021. *Id.* ¶¶ 15–19. He further asserts that until 2023, Mr. Taylor "did not disagree" that Mr. Gupta had "back-owed incentives" and suggested that they might be coming later. *Id.* ¶ 18; *see also* ¶¶ 15–16 (noting Mr. Taylor's comments that "he hadn't looked into [the incentive payments] yet and would get back to [Mr. Gupta]" and that "2ndWave was still 'not out of the woods'"). For his part, Mr. Taylor asserts that throughout this period, he believed Mr. Gupta understood that any incentive payments to which he was entitled were included in the year-end bonus payments calculated using the "'team-based' bonus approach." Taylor Decl. ¶¶ 10-12, ECF No. 26-5.[3]

In addition to inquiring about his back-owed incentives, Mr. Gupta alleges that on several occasions he asked Mr. Taylor about when 2ndWave would establish a 401(k) plan, and that Mr. Taylor told Mr. Gupta that he was working on it. Pl.'s Answers to Interrogs. at 11, ECF No. 32-11; *see also* FAC ¶¶ 68, 96. 2ndWave did not establish a 401(k) Plan until 2023, after Mr. Gupta's separation process had already begun. DSOF ¶ 36; FAC ¶ 96.

Mr. Gupta's growing dissatisfaction with his employment at 2ndWave came to a head in 2023. On February 27 of that year, Mr. Gupta sent Mr. Taylor a lengthy email detailing the ways in which he felt he had been undercompensated for his substantial contributions to 2ndWave's success and had not been given the professional opportunities that Mr. Taylor had promised. *See*

---

[3] The Parties' differing views of what was discussed and understood during this period are perhaps best reflected in the emails they exchanged in 2023 that ultimately led to Mr. Gupta's separation from 2ndWave. *See* ECF Nos. 30-6, 30-7, 30-9. These emails, which are discussed in greater detail below, encapsulate the positions that both men have since reaffirmed in their depositions and declarations.

ECF No. 30-6. Mr. Gupta asserted that "despite the fact that [he and Mr. Taylor] ha[d] discussed [his compensation structure and incentives] a number of times," he still had "not received adequate clarity." *Id.* at 2. He did not understand why he still had not been paid the incentives promised in his Offer Letter and claimed that he was still owed Utilization Incentives from the second quarter of 2016 onward and Sales Incentives for more than five projects. *Id.* He also asked for an update on when the 401(k) plan that had been promised and "under development" for more than seven and a half years would finally be provided. *Id.*

On March 1, 2023, Mr. Gupta sent a separate email to Mr. Taylor expressing concern that he had been proposed as "Key Personnel and the Project Manager" on a project with the Commerce Department without his awareness and despite his having previously expressed concerns to Mr. Taylor about serving in that role. ECF No. 26-17. Later that evening, Mr. Taylor sent separate email responses to Mr. Gupta about the Commerce Department project and then about his compensation and advancement concerns. *Id.*; ECF No. 26-18.

As to the Commerce Department project, Mr. Taylor asserted that he had previously "made clear that [he] . . . intended to bid [Mr. Gupta] as the [Project Manager]." ECF No. 26-17. But he said he would remove Mr. Gupta from the role because he could not "have someone that is not fully committed to its success as the lead for this strategic project." *Id.*

In response to Mr. Gupta's compensation and advancement concerns, Mr. Taylor rejected Mr. Gupta's characterization of what he claimed to be owed. ECF No. 26-18. Mr. Taylor asserted that the "draft/proposed incentive structure" attached to Mr. Gupta's Offer Letter had never been "finalized or signed" and had been replaced after Mr. Gupta's hiring with a "team-based incentive structure" linked to "overall firm performance." *Id.* Under that structure, there was no "utilization incentive" and "[s]ales incentives ha[d] been rolled into the overall team bonus, with some

exceptions for wins that 'move the needle.'" *Id.* Regarding advancement, Mr. Taylor said that Mr. Gupta had "not demonstrated [] readiness [to lead] any of [2ndWave's] current or potential client accounts." *Id.* Mr. Taylor affirmed that 2ndWave had "recently completed an analysis of 401(k) plans," with implementation awaiting "final decisions" by Mr. Taylor. *Id.* And he concluded by noting that he had discussed "[m]ost if not all of these items . . . with [Mr. Gupta] previously" and that if Mr. Gupta was "still unsatisfied," they should "discuss the appropriate timing of [Mr. Gupta's] transition out of the firm." *Id.*

Things only spiraled downward from there. On March 9, 2023, Mr. Gupta wrote to Mr. Taylor that he was "shocked and dismayed" by Mr. Taylor's response and that, among other things, he "was never informed" that the incentive structure in his "employment agreement" was being altered. ECF No. 30-9. On March 13, 2023, Mr. Gupta emailed Mr. Taylor regarding his potential designation as a part-time project manager on a new project, saying that it "exemplifie[d] [his] concerns" about not being assigned projects that gave him "the growth to achieve [his] professional goals of Account Management." ECF No. 26-20; DSOF ¶ 41. For Mr. Taylor, this was apparently a bridge too far. On March 31, 2023, he convened a telephone conference at which he proposed that Mr. Gupta resign. DSOF ¶¶ 42–43. Soon after, Mr. Taylor prepared and sent Mr. Gupta a "transition agreement." DSOF ¶ 43; *see also* ECF No. 27-10. In the months that followed, Mr. Gupta did not sign the agreement or otherwise resign. DSOF ¶ 44.

On November 14, 2023, Mr. Taylor sent Mr. Gupta notice of his termination. DSOF ¶ 45; *see also* ECF No. 27-11. Mr. Taylor explained that he was terminating Mr. Gupta because of "serious performance deficiencies" related to his refusal "to carry out [his] essential duties." Termination Ltr., ECF No. 26-9. He cited: (1) Mr. Gupta's March 1, 2023, email "expressing dissatisfaction with being proposed as the Project Manager for the Commerce" project;

(2) Mr. Gupta's March 13, 2023, email "express[ing] concern about being proposed" as a project manager on a separate project; and (3) Mr. Gupta's notice in February 2023 to 2ndWave's "'Business Development Lead' that [Mr. Gupta] did not have time to participate in . . . pipeline management meetings, a key element of the firm's business development activities." *Id*. Mr. Taylor concluded by noting that he had given Mr. Gupta seven months to resign, but given his unwillingness to do so, Mr. Taylor was "initiating [the] termination process." *Id.*

### B.    Procedural Background

Mr. Gupta file this lawsuit against Mr. Taylor and 2ndWave on December 7, 2023. Compl., ECF No. 1. He filed an Amended Complaint on February 19, 2024. FAC, ECF No. 11. He brings claims alleging non-payment of wages and retaliatory termination under the D.C. Wage Payment and Collection Law (Counts I and II), breach of contract (Count III), promissory estoppel (Count IV), and fraud (Count V). FAC ¶¶ 114–143. He also brings a sixth claim seeking an accounting by the Defendants of all wages owed (Count VI). FAC ¶¶ 144–47. On May 9, 2025, the Defendants moved for summary judgment on all Mr. Gupta's claims. Defs.' Mot. Summ. J., ECF No. 25. That same day, Mr. Gupta cross-moved for partial summary judgment on his breach of contract claim. Pl.'s Mot. Partial Summ. J., ECF No. 27. Those motions are fully briefed and ripe for review. *See* Defs.' Opp'n Mot. Partial Summ. J., ECF No. 28; Pl.'s Opp'n Mot. Summ. J., ECF No. 29; Pl.'s Reply Supp. Mot. Partial Summ. J., ECF No. 32; Defs.' Reply Supp. Mot. Summ. J., ECF No. 33.

### LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006) (citations omitted). "The evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When "both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*, 429 F. Supp. 2d at 67 (citations omitted).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Est. of Parsons.*, 651 F.3d at 123. "Courts must avoid making 'credibility determinations or weighing the evidence,' since 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Rothberg v. Xerox Corp.*, No. 12-cv-617, 2016 WL 10953882, at *10 (D.D.C. Feb. 3, 2016) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)) (cleaned up). But a court may "evaluate an inadequately supported assertion of material fact and deem it not materially disputed." *Id.* "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## DISCUSSION

The Court begins with Mr. Gupta's breach of contract claim, which is the core of this lawsuit, then addresses his remaining claims in turn. Because there are material facts in dispute, Mr. Gupta is not entitled to summary judgment on his breach of contract claim. And the Defendants are not entitled to summary judgment on any claim except the portions of Mr. Gupta's contract claim premised on the Defendants' failure to pay him Sales Incentives or provide a 401(k).

### A.    Breach of Contract (Count III)

Both sides ask the Court to grant summary judgment on Mr. Gupta's breach of contract claim. Mr. Gupta claims that his employment agreement with 2ndWave included Sales Incentives, Utilization Incentives, and Other Firm Incentives that he earned but were not paid in full. *See* Pl.'s Mem. Supp. Mot. Partial Summ. J. (Pl.'s Mot.) 2–10, ECF No. 27-1. The Defendants, meanwhile, argue that the Offer Letter provided no enforceable formulas for calculating these incentives and they dismiss the Attachment to the Offer Letter as an unenforceable "agreement to agree." Defs.' Mem. Supp. Mot. Summ. J. (Defs.' Mot.) 8–20, ECF No. 25. They further argue that if Mr. Gupta ever had contractual rights to incentives, he has waited too long to assert them. *Id.* And they contend that Mr. Gupta cannot claim breach of contract based on 2ndWave's failure to provide a 401(k) since he was never promised a 401(k) by a certain date. *Id.* The Court is persuaded by the Defendants' arguments regarding Sales Incentives and the promise of a 401(k). But it otherwise finds that disputed material facts foreclose the entry of summary judgment on Mr. Gupta's breach of contract claim.

### 1.    Incentive Payments

To prevail on a breach of contract claim in the District of Columbia, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). To carry this burden, the party seeking to enforce a contract must demonstrate both: "(1) intention of the parties to be bound; and (2) agreement as to all material terms." *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007).

Enforceable contracts can be written or oral. *See Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995). When a contract is committed to writing, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties" regardless of their intent at the time they entered the contract, "unless the written language is not susceptible of a clear and definite under[standing], or unless there is fraud, duress or mutual mistake." *Joyner v. Est. of Johnson*, 36 A.3d 851, 855 (D.C. 2012) (cleaned up). "[W]here a contract is ambiguous, *i.e.*, reasonably susceptible of different constructions or interpretations, the meaning of the language must be evinced from extrinsic evidence [of] the intent of the parties[.]" *District of Columbia v. D.C. Pub. Serv. Comm'n*, 963 A.2d 1144, 1155–56 (D.C. 2009) (cleaned up). Deriving intent from extrinsic evidence is inherently "a factual determination," making summary judgment "necessarily improper." *Id.* at 1156.

Here, the crux of Mr. Gupta's breach of contract claim is that the Offer Letter and accompanying Attachment require payments for Sales Incentives, Utilization Incentives, and Other Firm Incentives that the Defendants did not make. To defeat the Defendants' motion for summary judgment on this claim, Mr. Gupta must show that a jury could reasonably conclude: (1) that the Defendants agreed to pay Mr. Gupta these incentive payments; (2) that the Defendants breached that agreement by failing to make required payments; and (3) that Mr. Gupta was damaged as a result. To prevail on his own summary judgment motion, Mr. Gupta must show that no jury could reasonably conclude otherwise.

As to Utilization and Other Firm Incentives, Mr. Gupta has avoided the Defendants' Motion for Summary Judgment but has not shown his own entitlement to summary judgment. While a jury could reasonably find for Mr. Gupta on each element of his claim as it relates to these incentives, it could also come out the other way. Sales Incentives, however, are a different matter.

Although the Court concludes that a jury could find the existence of an agreement to pay such incentives, no reasonable jury could find that the Defendants breached it. The Court thus grants summary judgment to the Defendants on that part of the claim.

### a. Agreement

The Court has no trouble concluding that the Parties intended to be bound by the Offer Letter setting out the terms of Mr. Gupta's employment. The Offer Letter begins with an "offer" of employment and concludes with a request that Mr. Gupta indicate his acceptance. Offer Ltr. 1, 3. And it is signed by Mr. Taylor and Mr. Gupta. *Id.* It is similarly clear that the Parties agreed that Mr. Gupta's compensation would be based on both a "base salary and incentives," to include Sales Incentives, Utilization Incentives, and Other Firm Incentives. *Id.* 1.

It is less clear that the Parties had a shared understanding of the "material terms" governing Mr. Gupta's incentive payments—*i.e.*, when he would be paid such incentives and how they would be calculated. *See Perles*, 473 F.3d at 1249. But there is still sufficient evidence in the record for a jury to reasonably conclude that the Parties reached an enforceable agreement on that topic.

First, the Offer Letter expressly addresses each of the incentive types and the conditions that might warrant their payment. For Utilization Incentives, it states that Mr. Gupta's "base salary amount will be supplemented with a utilization incentive" if he "meets or exceeds" certain utilization targets. Offer Ltr. 2. And it describes how the targets and bonus amounts will be formulated mathematically. *Id.* (explaining that bonuses will be based on "the total hours billed to clients divided by total billable hours per year" and "assumes a minimum billing rate of approximately $125 per hour" unless an exception applies). Similarly, for Sales Incentives, it states that Mr. Gupta "will be eligible" for a bonus if he contributes "in a significant way" to "identifying and closing new opportunities" for the firm. *Id.* 1. It also explains that the bonus "will be based on

14

a percentage of collected revenue above [the] baseline revenue target." Finally, as to Other Firm Incentives, the Offer Letter states that Mr. Gupta "will also be eligible for a bonus based on helping the firm reach certain objectives." *Id.* 3.

Second, the "Incentive Compensation Components" document referenced in and attached to the Offer Letter provides further evidence of what the Parties believed they were agreeing to regarding the payment of incentives. The Parties unsurprisingly dispute the import of this Attachment. And as a threshold matter, it is clear that the Attachment in and of itself is not an enforceable written contract—it was labeled as a "draft," it was never signed by either party, and it was to "be finalized in discussions . . . within the first 30 days of [Mr. Gupta's] employment." Offer Ltr. 2, 4–5. Even so, there is nothing to stop a jury from looking to the Attachment as evidence of what material terms the Parties intended to agree to if the jury finds the language of the Offer Letter itself is insufficiently clear. *See D.C. Pub. Serv. Comm'n*, 963 A.2d at 1155–56; *see also Pernice v. Bovim*, 183 F. Supp. 3d 84, 87–88 (D.D.C. 2016) ("Under District of Columbia law, . . . if contractual terms are ambiguous," the ambiguity must be resolved "by examining extrinsic evidence."). The Attachment might shed light, for example, on what sorts of "objectives" Mr. Gupta needed to help 2ndWave achieve to be "eligible" for Other Firm Incentives; what it meant for him to "contribute, in a significant way," to securing new sales opportunities; and whether the Parties' understood Mr. Taylor's "sole discretion" over bonus amounts to cover *only* Sales Incentives or all types of incentive payments. *See* Offer Ltr. 1–5.

Finally, Mr. Gupta asserts that he and Mr. Taylor had further discussions regarding his incentive payments after they signed the Offer Letter. Specifically, he says that he and Mr. Taylor "discussed and agreed" that he would be paid an incentive for "utilization that was above 50%"— a formula he claims the Defendants used to calculate his Utilization Incentives in Quarter 4 of

2015 and Quarter 1 of 2016. Gupta Decl. ¶¶ 9–10. This, too, is evidence a jury might consider to determine exactly what material terms the Parties intended to be bound by.

For all these reasons, a jury could reasonably conclude that the Parties reached an enforceable agreement requiring 2ndWave to pay Mr. Gupta incentives.

### b. Breach

Turning to breach, Mr. Gupta argues that the Defendants breached the agreement between the Parties by failing to pay the required amounts of Sales Incentives, Utilization Incentives, and Other Firm Incentives from 2015 to 2023.[4] The Defendants make two primary arguments in response. First, they argue that they could not have breached the agreement after 2018, when they modified any agreement with Mr. Gupta. Second, they argue that all incentive payments were discretionary in any event, making it impossible for them to breach any agreement.

The Defendants first argue that they modified any agreement when Mr. Taylor announced a new compensation structure for the firm in 2018. Defs.' Mot. 14–17. According to the Defendants, Mr. Gupta acknowledged and accepted this modification to his compensation by repeatedly accepting the annual bonuses, thanking Mr. Taylor for them, and continuing to work for 2ndWave for many years thereafter. *Id*. This argument is compelling, but it assumes the truth of facts that are in dispute. Mr. Gupta maintains that the 2018 compensation structure change did not apply to him or modify his original employment agreement. *See* Gupta Email to Taylor (Mar. 9, 2023), ECF No. 30-9 (asserting that he "was never informed" that the incentive structure in his employment agreement had been modified). And he points to record evidence suggesting that his

---

[4] Mr. Gupta claims unpaid incentives totaling $479,061.64. *See* Pl.'s Reply at 15, Ex. 11, ECF No. 32-12. This includes approximately $382,000 in unpaid Sales Incentives from 2016–2023, $87,000 in unpaid Utilization Incentives from 2015–2023, and $10,000 in unpaid Other Firm Incentives/"'Other Objectives' Bonuses" in 2016 and 2017.

compensation package was unique given his status as one of 2ndWave's earliest hires. Pl.'s Reply 13; *see also, e.g.*, Taylor Dep. 63:11–19, ECF 30-5 (noting that at the time Mr. Gupta was hired, he was the only person at the firm "making incentives based on . . . sales and utilization"). Under these circumstances, a jury could conclude that Mr. Gupta did not understand or accept Mr. Taylor's 2018 announcement as a modification of his contractual rights. The cases cited by the Defendants are thus distinguishable because they involve plaintiffs who acknowledged the applicability of the relevant policy changes and continued their employment regardless. *See, e.g.*, *Kauffman v. Int'l Bhd. Of Teamsters*, 950 A.2d 44, 47–48 (D.C. 2008) (plaintiff "admitted that he knew [defendant] would no longer pay [his] housing allowance . . . and yet he continued the employment for three more years"); *Hauser v. Watson*, 60 A.2d 698, 699 (D.C. 1948) ("It is conceded . . . the plaintiff was told that he would not be paid both bonuses and commissions [and] continued to work for eighteen months[.]").

Next, the Defendants claim broad discretion to make incentive payments and contend that they exercised that discretion to pay Mr. Gupta bonuses "in every year he was eligible to receive one." Defs.' Mot. 12. As for Sales Incentives, the Defendants are correct. The Offer Letter signed by the Parties provides that Mr. Gupta "will be eligible for a sales incentive bonus" if he "contribute[s], in a significant way, to identifying and closing new opportunities for 2nd[W]ave." Offer Ltr. 1. It further provides that "final bonus amounts [for Sales Incentives] are at the sole discretion of the 2ndWave CEO." *Id*. These provisions leave Mr. Gupta's entitlement to Sales Incentives solely in Mr. Taylor's discretion. Thus, a reasonable jury could not conclude that the Defendants breached the employment agreement by not paying Mr. Gupta Sales Incentives or by paying him insufficient incentives. *See Hill v. Xtreme Sols., Inc.*, No. 23-cv-2685, 2024 WL 4103701, at *6 (D.D.C. Sept. 6, 2024) (company "would not breach an agreement by denying" an

employee a benefit that was within the company's "sole discretion"); *see also Dorsey v. Jacobson Holman, PLLC*, 756 F. Supp. 2d 30, 36–37 (D.D.C. 2010) (granting summary judgment for the defendants on a wage payment claim where court found that yearly bonus payments were "discretionary").

Mr. Gupta contends that Mr. Taylor's "sole discretion" was limited to determining "final bonus amounts" and did not give Mr. Taylor "discretion to deny [Mr.] Gupta the sales bonus altogether." Pl.'s Opp'n 5. But this interpretation of the Offer Letter's plain language strains credulity and Mr. Gupta cites no legal authority supporting it.[5] In the Court's view, the Offer Letter's specification that Mr. Gupta may be "eligible" for—but not entitled to—Sales Incentives, along with its grant of "sole discretion" to Mr. Taylor to determine the "final bonus amounts" of any such incentives, Offer Ltr. 1, unambiguously gives the Defendants the discretion to pay Mr. Gupta no Sales Incentive at all. No reasonable jury could conclude otherwise and thereby find the Defendants liable.

The same is not true of Utilization Incentives. The Offer Letter's description of Utilization Incentives contains no language conferring discretion on Mr. Taylor. Although the Attachment includes language suggesting that all "final bonus amounts" were at the "sole discretion" of

---

[5] Mr. Gupta's primary argument in support of his interpretation is that Mr. Taylor "testified at deposition that [his] 'sole discretion' related to the allocation of 3%, 2%, or 1% to those who contributed to the sale." Pl.'s Reply 7. But Mr. Gupta has not provided those pages of the deposition testimony. Nor has he pointed to other record evidence of the "phone call" he claims occurred in which Mr. Taylor purportedly "stated that 'discretion' referred to [his] decision to designate the Sales Incentive as 1%, 2%, or 3%." Pl.'s Opp'n 5. Even if the Court had such evidence to consider, however, it is extrinsic evidence of the Parties' intent that cannot override the plain meaning of the document they signed. *Joyner*, 36 A.3d at 855 (When a contract is committed to writing, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties" regardless of their intent at the time they entered the contract, "unless the written language is not susceptible of a clear and definite under[standing.]" (cleaned up)). Such evidence, if Mr. Gupta produces it at trial, may support his fraud claim, but it cannot support this portion of his breach of contract claim.

Mr. Taylor, *id.* 3, the Defendants themselves claim that the Attachment is not binding on the Parties. While a jury could credit the Attachment as extrinsic evidence and find that any Utilization Incentives were the result of Mr. Taylor appropriately exercising his discretion, that is a factual question that is inappropriate for resolution at summary judgment. Indeed, on this record, Mr. Gupta may well convince a jury that he was entitled to larger Utilization Incentive payments than he received. *See* Pl.'s Reply 15 (citing "spreadsheet recapping damages," Ex. 11, ECF No. 32-12); *see also Pernice*, 183 F. Supp. 3d at 88 ("discern[ing] what level of performance [the parties] bargained for . . . depends upon [determining] the intent and understanding of the parties at the time of contracting, which in this case is unclear").

Whether the Other Firm Incentives were intended to be at the Defendants' discretion is an even closer call. The Offer Letter says that Mr. Gupta "will [] be eligible for a[n] [Other Firm Incentives] bonus based on helping the firm reach certain objectives" and that the "maximum bonus amount will be pro-rated based on how many of the firm objectives are met." Offer Ltr. 2. Nothing in the Offer Letter says how eligibility is determined—for example, if it is subject to Mr. Taylor's discretion or automatically established by meeting certain objectives. The Attachment details specific objectives that may help illuminate what the Parties had in mind. *Id.* 5. But it is up to a jury to determine whether it should credit that evidence and, if so, how to weigh it—especially against the Attachment's general disclaimer that "final bonus amounts are at the sole discretion of [Mr. Taylor]." *Id.* 4. This, too, cannot be resolved by the Court at summary judgment.

For all these reasons, a reasonable jury could conclude that the Defendants breached their duty to pay Mr. Gupta Utilization Incentives and Other Firm Incentives. But the Court grants summary judgment for the Defendants as to Mr. Gupta's claim for unpaid Sales Incentives.

### c. Statute of Limitations

The Defendants contend that even if Mr. Gupta once had a viable breach of contract claim for unpaid incentives, that claim is now barred by the statute of limitations. The Court disagrees that summary judgment can be granted on this basis.

Actions for breach of contract in the District of Columbia must be brought within three years "from the time the right to maintain the action accrues." D.C. Code § 12-301(a)(7). "An action for breach of contract generally accrues at the time of the breach." *Wright v. Howard Univ.*, 60 A.3d 749, 751 (D.C. 2013). While D.C. courts generally apply statutes of limitation strictly, the D.C. Court of Appeals has recognized "at least two limited exceptions" to that practice. *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998). First, "[u]nder the 'discovery rule,' the running of a limitations period may in some circumstances be tolled until the plaintiff knows or reasonably should have known of the injury." *Wright*, 60 A.3d at 751 n.1. In a breach of contract suit, this happens when the plaintiff knows or reasonably should have known he was "receiving something substantially less or different from that for which he bargained." *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C. 1970). Second, "[u]nder the lulling doctrine, a defendant cannot assert the bar of the statute of limitations, if it appears the defendant has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run." *East*, 718 A.2d at 156-57 (cleaned up).

Here, the Defendants argue that any contractual rights to incentive payments that Mr. Gupta held under the Attachment to his Offer Letter expired on December 31, 2016, as that document was expressly limited to "the 2015-2016 timeframe." Defs.' Mot. 13–14; *see also* Offer Ltr. 4. They further assert that even if Mr. Gupta had contractual rights that extended beyond 2016, any breach of those rights "occurred no later than December 13, 2018, when [Mr.] Taylor

announced a change in how bonuses would be calculated." Defs.' Mot. 18. Mr. Gupta does not appear to contest that he knew of the breach more than three years before filing suit, but relies instead on the lulling doctrine to evade summary judgment. Pl.'s Opp'n 31–33. While the Court doubts that Mr. Gupta can ultimately carry his burden on the lulling doctrine, it is inherently a factual issue that cannot be resolved at summary judgment.

The lulling doctrine has generally been interpreted "narrowly." *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986). Parties invoking the doctrine are required to show that they were affirmatively lulled into inaction by "not only an acknowledgement of indebtedness, but a promise to pay." *Id.* at 937 (quoting *Hornblower v. George Washington Univ.*, 31 App. D.C. 64, 73 (D.C. Cir. 1908)). At the same time, courts have repeatedly recognized that determining the doctrine's applicability is factually intensive. They have thus been loath to deny parties a complete opportunity to prove their entitlement to the doctrine's protections. In *Grass v. Eiker*, 123 A.2d 613 (D.C. 1956), for example, the D.C. Court of Appeals reversed a grant of summary judgment when it found that, "[a]lthough the probability appear[ed] slight," the appellants might show at trial that "the delay in enforcing their claims was induced" by the appellant's "representations or promises . . . acknowledgments and admissions." *Id.* at 614–15.

Here, there is evidence in the record of multiple interactions between Mr. Gupta and Mr. Taylor where Mr. Gupta understood Mr. Taylor to be assuring him that the Defendants would pay his outstanding bonuses. *See, e.g.*, Gupta Decl. ¶¶ 13–18. To be sure, the record evidence is far from overwhelming. In fact, Mr. Gupta, like the appellants in *Grass*, may well have only a "slight" probability of ultimately showing that he was affirmatively induced to delay enforcement

21

of his claims. *Grass*, 123 A.2d at 614.[6] But there is enough here to preclude summary judgment on statute of limitations grounds, as the cases cited by both Parties make clear. *See Bailey*, 516 A.2d at 941 (reversing a grant of summary judgment to permit the plaintiff in a slip and fall case to attempt to show that the defendant's "lulling" had "prevented [her] from filing suit against the correct insurer"); *Moore v. Snider*, 109 F.2d 840, 842 (D.C. Cir. 1940) (reversing a grant of judgment on the pleadings so that the defendant could introduce evidence that she had not in fact indicated a willingness to pay); *Brown v. Lamb*, 414 F.2d 1210, 1210–12 (D.C. Cir. 1969) (affirming lower court judgment *after* trial that plaintiff had not been lulled where plaintiff had "successfully resisted a pretrial motion for summary judgment on representations that there were material issues of fact to be tried with reference to whether appellees were estopped from pressing the limitations defense"); *Howard University v. Cassell*, 126 F.2d 6, 7, 12 (D.C. Cir. 1941) (finding that record developed at trial did not show that the defendant had "actually induced [the plaintiff] "not to bring his suit").

### 2.    401(k)

Finally, the Defendants argue that Mr. Gupta cannot base his breach of contract claim on a failure to implement a 401(k) plan. Defs.' Mot. 18–20. The Court agrees.

As a preliminary matter, the Defendants wrongly assert that the Complaint does not include damages related to a 401(k) plan as part of the breach of contract claim. Defs.' Mot. 18–19. Count III alleges that the Defendants "breached their contract with Gupta by failing and refusing to pay

---

[6] When *Grass* made its way back to the Court of Appeals after trial, the Court affirmed the trial court's grant of a directed verdict for the defendant on the grounds that the plaintiffs had not adduced "sufficient [evidence] to estop [the defendant] from pleading the statute [of limitations]." *See Grass v. Eiker*, 135 A.2d 153, 154 (D.C. 1957).

the sums due to Gupta," FAC ¶ 131, and paragraph 107 of the Complaint lists "$60,000" flowing from the "loss" of a 401(k) among the "Total sums due and owing to Gupta," FAC ¶ 107.

On the merits, however, the claim fails. Unlike with incentive payments, neither the Offer Letter nor the Attachment include any language that could be understood as a firm guarantee that Mr. Gupta would be provided with a 401(k). The single reference in either document to a 401(k) is a sentence in the Offer Letter which lists a "401(k)" among other benefits that "are under development" and which Mr. Gupta "will be invited to participate in . . . once they are finalized." Offer Ltr. 2. This language falls well short of giving Mr. Gupta an enforceable contractual right. And Mr. Gupta points to no record evidence that the Defendants ever made firmer promises related to establishing a 401(k) beyond Mr. Taylor's periodic assurances that he was working on it. Pl.'s Answers to Interrogs. at 11, ECF No. 32-11; *see also* FAC ¶ 68. The Court thus grants summary judgment on this aspect of the breach of contract claim.

*    *    *

For all the above reasons, the Court denies Mr. Gupta's motion for summary judgment on his breach of contract claim. The Court grants in part and denies in part the Defendants' motion for summary judgment on the same claim. It grants summary judgment for the Defendants as to the portions of the contract claim regarding unpaid Sales Incentives and a 401(k). But it denies summary judgment as to the portions of the claim regarding Utilization Incentives and Other Firm Incentives, which will proceed to trial.

### B.  Nonpayment of Wages (Count I)

The Court turns next to Mr. Gupta's claim for nonpayment of wages under the D.C. Wage Payment and Collection Law (DCWPCL), D.C. Code §§ 32-1301 *et seq*. As this claim is tethered closely to Mr. Gupta's breach of contract claim, it too survives summary judgment.

The DCWPCL sets requirements for "how and when employers must pay their employees' wages and it establishes a framework for recovery against an employer who violates its provisions." *Rothberg*, 2016 WL 10953882, at *15 (cleaned up). The law generally requires that employers pay their employees "all wages" that they have earned, even if they have been terminated, D.C. Code § 32-1302, and defines "wages" as "all monetary compensation after lawful deductions, owed by an employer, whether the amount owed is determined on a time, task, piece, commission, or other basis of calculation," *id.* § 32-1301(3). This definition expressly includes "bonus[es]," as well as "[o]ther remuneration promised or owed . . . (i) [p]ursuant to a contract for employment, whether written or oral; (ii) [p]ursuant to a contract between an employer and another person or entity; or (iii) [p]ursuant to District or federal law." *Id.* §§ 32-1301(3)(A), (E).

Here, the Defendants argue that the success of Mr. Gupta's claim for nonpayment of wages "depends on the success of his contract claim" because he cannot prove he has unpaid wages unless he proves a contractual or other entitlement to the bonuses in question. Defs.' Mot. 8. Mr. Gupta resists this formulation, arguing that he need not establish the existence of a contract to recover wages under the DCWPCL—and may instead rely on promissory estoppel, for example. Pl.'s Opp'n 31. Given that portions of Mr. Gupta's breach of contract claim will proceed, the Court need not resolve this dispute.[7] Just as a reasonable jury could conclude that Mr. Gupta is contractually owed Utilization and Other Firm Incentives that he has not been paid, so too that jury could conclude that he is owed wages that must be paid under the DCWPCL. Accordingly, summary judgment on this claim is inappropriate.

---

[7] As explained below, however, Mr. Gupta cannot seek damages arising from the Defendants' failure to pay Sales Incentives or provide a 401(k) based on promissory estoppel.

### C.    Promissory Estoppel (Count IV)

Mr. Gupta next asserts a claim of promissory estoppel in the event the Court or the jury "find that no [employment] contract existed." FAC ¶ 136. The Defendants attack this claim with many of the arguments previously addressed. Defs.' Mot. 20–23. Those arguments come up short here as well.

"In order to find a party liable on a theory of promissory estoppel, there must be evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee." *Simard v. Resol. Tr. Corp.*, 639 A.2d 540, 552 (D.C. 1994). "The promise must be definite, as reliance on an indefinite promise is not reasonable." *In re U.S. Off. Prods. Co. Sec. Litigat.*, 251 F. Supp. 2d 58, 73 (D.D.C. 2003). And "though a promise need not be as specific and definite as a contract, it must still be a promise with definite terms on which the promisor would expect the promisee to rely." *Id.* (citing *Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C. 1979)).

The record contains sufficient evidence of all these elements to permit Mr. Gupta's claim to proceed to trial. While he might ultimately fail to prove a contractual entitlement to incentives, the Offer Letter, Attachment, and surrounding conversations between Mr. Gupta and Mr. Taylor are certainly "evidence of a promise." *Simard v. Resol. Tr. Corp.*, 639 A.2d at 552. A jury could reasonably find that the promises evinced by that evidence, especially in the Offer Letter and Attachment, include sufficiently definite terms that 2ndWave would expect Mr. Gupta to rely on. *See Off. Prods. Co. Sec. Litigat.*, 251 F. Supp. 2d at 73. Further, Mr. Gupta accepted his employment with 2ndWave, supporting that he did reasonably rely on those promises. And there is evidence that in accepting employment at 2ndWave, Mr. Gupta declined to pursue other

opportunities that may have been more lucrative. Gupta Decl. ¶¶ 5–8. Accordingly, a reasonable jury could conclude that the Defendants are liable to Mr. Gupta on a theory of promissory estoppel.

The Defendants' potential liability under this theory, however, does not extend to damages arising from their failure to pay Sales Incentives or provide a 401(k). Any promises that those would be provided are contradicted by the plain language of the Offer Letter that Mr. Gupta signed. That Offer Letter makes clear that a 401(k) was not guaranteed and that Mr. Gupta's entitlement to Sales Incentives was subject to Mr. Taylor's sole discretion. Offer Ltr. 1–2. No jury looking at that language could find that Mr. Gupta reasonably relied on promises to the contrary. *See Willoughby v. Potomac Elec. Power Co.*, No. 94-cv-1313, 1995 WL 761308, at *5 (D.D.C. Dec. 14, 1995) (to prevail on a theory of promissory estoppel a "plaintiff's reliance must have been reasonable and justifiable" (cleaned up)). Mr. Gupta thus cannot use promissory estoppel to revive his claims for damages related to Sales Incentives and the 401(k).

Finally, the Defendants assert that this claim, too, is barred by a three-year statute of limitations. Defs.' Mot. 20-21; *see also* D.C. Code § 12-301(a)(8) (providing that actions "for which a limitation is not otherwise prescribed" must be brought within "3 years" of the "the time the right to maintain the action accrues"). Their argument is compelling. But like the breach of contract claim, there are factual questions bound up in whether the lulling doctrine applies. *See supra* A.1.c. The Court thus declines to find at this stage that Mr. Gupta's promissory estoppel claim is time-barred.

### D.    Fraud (Count V)

Next up is Mr. Gupta's claim that the Defendants fraudulently misled him into believing that he would receive bonuses they had no intention of paying. FAC ¶¶ 140–42. This claim, too, survives summary judgment.

A plaintiff claiming fraud under D.C. law must prove that a defendant (1) made a false representation, (2) in reference to a material fact, (3) with knowledge of the representation's falsity, (4) with the intent to deceive, and (5) that the plaintiff acted in reliance on the representation. *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977). "A promise or contractual commitment may be actionable as fraud (misrepresentation) if at the time of its making, the promisor had no present intention of carrying it out." *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1234 (D.C. 2005). So too if "a person positively states that something is to be done or is to occur, when he knows the contrary to be true." *Id.* "Nondisclosure or silence" may also "constitute fraud." *Bennett*, 377 A.2d at 59. While fraud must ultimately be proven "by clear and convincing evidence, which is not equally consistent with either honesty or deceit," *id.*, a party may resist summary judgment by "produc[ing] at least enough evidence to make a prima facie case." *Va. Acad.*, 878 A.2d at 1233 (cleaned up).

Here, Mr. Gupta has adduced sufficient evidence to survive summary judgment. He points to promises in the Offer Letter and Attachment about the bonuses he would receive (including that his "base salary *will* be supplemented with a utilization bonus" (emphasis added)), recounts conversations he and Mr. Taylor had about his compensation package before he accepted 2ndWave's offer, and asserts that he and Mr. Taylor had numerous interactions over the course of his employment where Mr. Taylor's comments (or lack thereof) led him to reasonably believe that he would eventually be paid the unpaid incentives. *See, e.g.*, Offer Ltr.; Gupta Decl. ¶¶ 6–19; Gupta Dep. 145, 159–63, ECF No. 26-2; Taylor Dep. 51, ECF No. 30-12. As with his other claims, Mr. Gupta's evidence is far from overwhelming. He identifies no comments by Mr. Taylor that could be described as a "smoking gun." Even so, the uncertainty surrounding exactly what was said, what was meant, and what was reasonably understood in the relevant interactions means that

27

this claim will turn on assessments of witness credibility, "weighing of the evidence," and "drawing of legitimate inferences" therefrom. *Rothberg*, 2016 WL 10953882, at 10*. Such determinations "are jury functions, not those of a judge" at summary judgment. *Id.*; *see also Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (when ruling on summary judgment, judges "are not to make credibility determinations or weigh the evidence").

As they have done before, the Defendants argue that even if Mr. Gupta once had a viable fraud claim, it is now barred by the statute of limitations. *See* Defs.' Mot. 33 (citing the three-year limitation imposed by D.C. Code §12-301(a)(8)). But again, the Court is not convinced. Particularly "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is *discovered*." *Merck & Co. v. Reynolds*, 559 U.S. 633, 644–45 (2010) (emphasis in original) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). To hold otherwise would turn "the law . . . designed to prevent fraud" into "the means by which it is made successful and secure." *Id.* at 644 (quoting *Bailey v. Glover*, 88 U.S. 342, 349 (1875)). Here, for reasons already discussed, a jury could reasonably conclude that Mr. Gupta did not discover he was being fraudulently deceived until after December 7, 2020, making his claim timely. *See supra* A.1.c.

### E.    Retaliation (Count II)

The Court next addresses Mr. Gupta's claim for retaliation under the DCWPCL. FAC ¶¶ 121–28. This claim also survives summary judgment.

The DCWPCL provides that it "shall be unlawful for any employer to discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee" because that employee has "[m]ade or is believed to have made a complaint to his or her employer . . . that the

employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the DCWPCL]." D.C. Code § 32-1311(a)(1).

Courts in this District apply the burden-shifting framework established in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973), to "statutory retaliation claims arising under District of Columbia law." *Bartolo v. Whole Foods Mkt. Grp., Inc.*, 412 F. Supp. 3d 35, 44 (D.D.C. 2019) (collecting cases); *see also Harbour v. Univ. Club of Washington*, 610 F. Supp. 3d 123, 135 (D.D.C. 2022). Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing: "(1) he 'engaged in statutorily protected activity'; (2) his 'employer took an adverse personnel action against' him; and (3) a causal connection exists between the two." *Bartolo*, 412 F. Supp. 3d at 44 (quoting *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1998)).

Once a plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* at 45. If the employer articulates such a reason, "the district court need not—and *should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, the "one central inquiry that remains is whether a reasonable jury could infer retaliation . . . from all the evidence" and conclude that the "employer's stated reason was pretextual." *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016) (cleaned up). The court must "evaluate this question 'in light of the total circumstances of the case,' asking 'whether the jury could infer [retaliation] from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Id.* (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012).

Here, Mr. Gupta makes out a prima facie retaliation case. There is record evidence: (1) that he engaged in statutorily protected activity by complaining to Mr. Taylor about 2ndWave's failure to pay him bonuses that he alleged he was contractually owed, *see, e.g.*, Gupta Email to Taylor (Feb. 27, 2023), ECF No. 30-6; (2) that Mr. Taylor terminated him, Termination Ltr., ECF No. 26-9; and (3) that his termination was causally connected to his complaining email because Mr. Taylor referenced transitioning Mr. Gupta out of 2ndWave in response and initiated his termination shortly thereafter, Taylor Email to Gupta (Mar. 3, 2023), ECF No. 26-18; *see also* DSOF ¶¶ 42–43 (describing how after Mr. Taylor convened a telephone conference with Mr. Gupta on March 31, 2023, to discuss Mr. Gupta's "serious performance deficiencies," he "proposed that [Mr.] Gupta resign," and provided him with a "Transition Agreement that would facilitate [his] separation from the firm").

With the burden shifted to the Defendants, they point to record evidence that they terminated Mr. Gupta not because of his complaint but because he "had become less interested in the business" and had "refused to carry out or was resistant to carrying out key job duties." Defs.' Mot. 26. They rely on three issues with Mr. Gupta's performance, all of which were articulated in the termination letter that Mr. Taylor sent to Mr. Gupta on November 14, 2023. First, in February 2023, Mr. Gupta said that "he no longer had 'bandwidth' to participate in weekly sales pipeline calls." Defs.' Mot. 26; *see also* Termination Ltr. Second, on March 1, 2023, Mr. Gupta expressed "'concern' and dissatisfaction" to Mr. Taylor about being identified as a Project Manager on a contract bid. Defs.' Mot. 27; *see also* Termination Ltr. And third, on March 13, 2023, Mr. Gupta again "expressed concern with the fact that Taylor wanted to identify him for a part-time Project Manager role on a new project opportunity." Defs.' Mot. 27; *see also* Termination Ltr. These reasons all seem legitimate on their face. And the Defendants may ultimately prove that these were

in fact the reasons that Mr. Gupta was terminated. The problem for them at this stage is that a reasonable jury evaluating the totality of the evidence might still infer that 2ndWave's actual motivation for Mr. Gupta's termination was retaliatory. The main reason for that is timing, but it is not the only reason. *See Minter v. D.C.*, 809 F.3d 66, 71–72 (D.C. Cir. 2015) ("[W]hen an employer comes forward with a legitimate, nonretaliatory reason for an employment action, positive evidence beyond mere proximity is required to create a genuine issue of material fact concerning whether the [employer's] motive . . . was retaliation." (cleaned up)).

Mr. Gupta emailed Mr. Taylor complaining about his unpaid bonuses on February 27, 2023. ECF No. 30-6. When he sent that email, Mr. Gupta had committed only one of the actions that purportedly justified his termination—asking to be removed from the weekly sales calls. And there is evidence supporting an inference that by the time Mr. Gupta committed the second action (sending Mr. Taylor an email on March 1, 2023, expressing concern about a new assignment, *see* ECF No. 26-17), Mr. Taylor was already considering terminating him. Specifically, the email Mr. Taylor sent Mr. Gupta on the evening of March 1, 2023, responding to his initial complaint, concluded by suggesting that they might need to "discuss the appropriate timing of [Mr. Gupta's] transition out of the firm." ECF No. 26-18. By March 9, 2023, when Mr. Gupta committed the third action (sending an email airing concerns about another project assignment, *see* ECF No. 30-9), he had already sent a follow-up email to Mr. Taylor about his complaint expressing his "shock[] and dismay[]" at Mr. Taylor's response to his assertion that he was still owed incentive payments, *see* ECF No. 27-9.

A reasonable jury assessing the totality of these circumstances could infer that Mr. Taylor had made up his mind about firing Mr. Gupta before Mr. Gupta aired any of his grievances about

the roles he was being assigned.[8] If a jury accordingly disregarded the second and third actions purportedly justifying Mr. Gupta's termination, it would be left considering whether Mr. Gupta's withdrawal from the sales pipeline calls justified his termination. And there is evidence in the record suggesting that Mr. Gupta's request to be removed from the calls for bandwidth reasons was only a temporary request. *See* Gupta Email to Morris Zwick (Mar. 10, 2023) (in which Mr. Gupta asks "if and why [he] ha[s] been permanently removed from th[e] [Weekly Sales Pipeline Call]"), ECF No. 26-19. If the jury inferred from that evidence that Mr. Gupta was in fact willing to rejoin the sales calls, it would be well on its way to finding that all the Defendants' proffered justifications for Mr. Gupta's termination were pretextual.

The Court is not convinced that a jury is likely to reach this conclusion. Indeed, the Court's general impression is that Mr. Taylor was acting in good faith. At summary judgment, however, it is not for the Court to assess Mr. Taylor's credibility or to weigh the evidence. A reasonable jury assessing the totality of the evidence could find that Mr. Gupta's retaliation claim is meritorious. Thus, he may present this claim to a jury at trial.

### F.    Accounting (Count VI)

Mr. Gupta's final count requests that the Court order the Defendants to render an accounting of all wages he is owed. FAC ¶¶ 144–47. The Defendants argue that an accounting is not a "stand-alone" claim but a "remedy that a plaintiff may obtain only upon prevailing on some independent claim." Defs.' Mot. 40. The Court generally agrees with the Defendants. But like other courts in this District, it declines to resolve the request for an accounting until after trial.

---

[8] Mr. Gupta's concerns about role assignment also appear to have been prompted by decisions that Mr. Taylor made *after* he received Mr. Gupta's initial complaining email. It is thus possible that a jury could infer that—after receiving Mr. Gupta's complaint and deciding to terminate him— Mr. Taylor deliberately assigned Mr. Gupta to roles that he knew would aggravate Mr. Gupta and might prompt Mr. Gupta to take actions that would further justify his termination.

"An accounting is a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation." *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 103 (D.D.C. 2006) (cleaned up). While an accounting may be necessary when a plaintiff "is unable to determine how much, if any, money is due him from another," *Alemayehu v. Abere*, 199 F. Supp. 3d 74, 86 (D.D.C. 2016) (cleaned), it is generally viewed as "'an extraordinary remedy' that is only appropriate, if at all, after liability has been determined," *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 48 (D.D.C. 2010) (quoting *Bates*, 466 F. Supp. 2d at 103). Because it is a form of relief, "[a] request for an accounting is 'not, strictly speaking . . . a stand-alone claim at all.'" *Butler v. Enter. Integration Corp.*, 459 F. Supp. 3d 78, 109 (D.D.C. 2020) (quoting *Haynes v. Navy Fed. Credit Union*, 52 F. Supp. 3d 1, 10 (D.D.C. 2014)). "But it is not unusual to leave such counts in place" until they can be resolved "at summary judgment or later, depending on whether [a plaintiff] can establish both liability on the breach of contract *and* insufficiency of legal damages." *Id.* (collecting cases).

Here, it is unclear whether an accounting will be necessary to determine any amounts owed. It may well be that Mr. Gupta is "[un]able to establish liability, obviating the need for an accounting." *Id.* But if he is successful on his other claims, "a court-ordered accounting may be the only way to determine" exactly what incentives he earned but was not paid. *Id.* Accordingly, the Court declines to grant summary judgment on Count VI at this time. Should Mr. Gupta establish liability at trial, the Court will hold him to the requirement that he make an appropriate showing that he is entitled to an accounting.

## CONCLUSION

For all these reasons, the Court denies Mr. Gupta's Motion for Partial Summary Judgment, ECF No. 27, and grants in part and denies in part the Defendants' Motion for Summary Judgment, ECF No. 25. The Court grants the Defendants' Motion with respect to the portion of Mr. Gupta's

breach of contract claim premised on the Defendants' failure to pay Sales Incentives and provide him with a 401(k), but denies the Defendants' Motion in all other respects.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   January 20, 2026